OF

# NORTH CAROLINA

AT

# RALEIGH

---

## FALL TERM, 1940

---

J. B. CALDWELL v. SOUTHERN RAILWAY COMPANY, JAMES S. EAGLE
AND JONES DALE.

(Filed 18 September, 1940.)

1. **Railroads § 9—In this action to recover for a crossing accident, plaintiff's evidence held not to establish contributory negligence as matter of law.**

   Plaintiff's car was struck by defendant's train at a grade crossing. Plaintiff's evidence tended to show that the crossing consisted of seven tracks, that the accident occurred on a foggy night, that three buildings, oil tanks, a coal shute and piles of coal were situate along the tracks on plaintiff's left, that before entering upon the crossing plaintiff stopped and looked both ways and did not hear or see any train approaching, that he crossed the first five tracks, that in the fifty feet between the fifth and sixth track he brought his car practically to a stop, that he then entered upon the sixth track and was struck by defendant's train, approaching from plaintiff's left, which he did not see until it was upon him, because of the atmospheric conditions, the obstructions, and the curvature of the track which threw the beam of the engine's headlight to the north of the track. *Held:* The evidence does not disclose contributory negligence as a matter of law, and defendant's motion for judgment as of nonsuit on this ground was properly overruled.

2. **Trial § 22b—**

   On a motion to nonsuit, the evidence will be considered in the light most favorable to plaintiff.

3. **Evidence § 26—**

   Where the visibility under the atmospheric conditions existing at the time of accident in suit is germane, testimony of witnesses as to the dis-

tance they were able to see at the place of the accident under similar atmospheric conditions is competent, but where the evidence shows that the night of the accident was foggy, testimony of the witnesses as to visibility at night in a misty rain or overcast sky does not disclose substantially similar conditions.

**4. Appeal and Error § 39d—**

The exclusion of testimony of two witnesses as to the visibility at the scene of the accident, even conceding their testimony discloses atmospheric conditions similar to those existing at the time of the accident, will not be held for prejudicial error when other witnesses testify without objection to substantially the same effect as the testimony excluded, and surveys, maps and photographs of the *locus in quo* and testimony of witnesses as to the location and surroundings at the scene of the accident, are admitted in evidence.

**5. Railroads § 8—**

Ordinarily, where no unusually dangerous or hazardous conditions exist at a grade crossing, timely signals by sounding the bell or blowing the whistle are sufficient warning of the approach of a train.

**6. Same—Where crossing is unusually hazardous, railroad company may be under duty in exercise of due care to provide warning devices.**

Where a railroad crossing is situate in a populous section and is much used by the public, and the crossing is obstructed by buildings or other objects proper in themselves, or by reason of the noise and confusion incident to business activity at the scene, the usual warnings by bell or whistle may be inadequate, it is for the jury to determine whether the crossing is peculiarly and unusually hazardous so as to require the railroad company, in the exercise of due care under the circumstances, to maintain a flagman or provide gates or gongs for the protection of the traveling public, and in this case, upon allegation and evidence that the crossing in suit, located in a populous section, was much used by the public, and that the view of travelers was obstructed by buildings, a coal chute and other objects along the right of way, the submission of the question to the jury is without error.

**7. Same—Failure to provide signal devices at hazardous crossing does not in itself constitute negligence.**

An instruction that if the jury should find that the crossing in suit was peculiarly and unusually hazardous and that the railroad company failed to maintain a flagman or any mechanical warning device, such failure would constitute negligence entitling plaintiff to recover if the proximate cause of the accident, is error as implying that upon proof that a crossing is unusually hazardous the failure to provide a flagman or mechanical signal device would in itself constitute negligence, while the correct rule is that proof that a crossing is unusually hazardous is merely evidence from which the jury may find that warning devices should be maintained in the exercise of ordinary care. In this case the error was rendered harmless by the fact that the correct principle of law was repeatedly stated in other portions of the charge, it being apparent that the jury was not misled by the inadvertence.

**8. Appeal and Error § 6f—**

The Supreme Court is not required to examine an excerpt from the charge for error in aspects not assigned as the ground for exception,

CALDWELL v. R. R.

Rules of Practice in the Supreme Court No. 28 and 27½, but it may nevertheless do so in its discretion.

**9. Appeal and Error § 39e—**

Where the court repeatedly states the correct rule of law applicable, an excerpt containing an incomplete statement of the principle will not be held for reversible error when it is apparent that the jury was not misled thereby and that appellants were in no way prejudiced.

**10. Appeal and Error § 39a—**

A new trial will not be awarded for error which, upon consideration of all circumstances surrounding the trial, could not have misled the jury or prejudiced the parties.

**11. Trial § 32—**

Where requests for instructions, embodying applicable principles of law, are substantially given in the charge, it is sufficient.

**12. Railroads § 9—**

In an action to recover for a crossing accident, a requested instruction that plaintiff would be guilty of contributory negligence unless his view was obstructed by fog or mist is properly refused when plaintiff's evidence also tends to show that his view was obstructed by buildings and other objects along the tracks.

**13. Appeal and Error § 39d—**

An exception to the exclusion of the testimony of a witness as to the contents of his weather report for the night on which the accident in suit occurred, cannot be sustained when it appears that the weather report was admitted in evidence and that the witness testified as to the weather conditions existing at the time.

CLARKSON, J., concurring.

BARNHILL, J., dissenting.

STACY, C. J., and WINBORNE, J., concur in dissent.

APPEAL by defendant from *Gwyn, J.,* at November Term, 1939, of ROWAN. No error.

This was an action to recover damages for injury to person and property alleged to have been caused by the negligence of the defendants, growing out of a collision between plaintiff's automobile and one of defendant railway company's trains, then being operated by the individual defendants as engineer and fireman respectively. The injury occurred on the night of 7 December, 1937, at a grade crossing on North Lee Street, in the city of Salisbury, North Carolina.

Plaintiff alleged failure of the defendants to give timely warning of the approach of the train by whistle or bell, and also alleged negligent omission to maintain gates, flagmen or other adequate means of warning at the crossing.

The following paragraph of the plaintiff's complaint, admitted in the answer, was offered in evidence:

3—218

"That the City of Salisbury is a municipal corporation of approximately 18,000 inhabitants, adjoining the town of Spencer on the north with an approximate population of 4,000 inhabitants, and that in said City of Salisbury and on the north side of the right of way of the North Carolina Railroad there are two main arterial highways leading from the City of Salisbury, northwardly through the suburbs of said city and town to the Town of Spencer, said highways or streets being known as North Main Street and North Lee Street in said city, and that both of said streets cross at street levels the line of the Southern Railway Company formerly known as the Western North Carolina Railroad, leading from Salisbury to Asheville, North Carolina; that the North Lee Street crossing, consisting of seven tracks, is not equipped with gates, electric signals, watchmen or other device or appliance to warn the traveling public of the approach of said trains at said crossing."

There was also evidence that the North Lee Street crossing was a much traveled crossing in the business section of the city, in the locality of railroad station, mills and business houses.

The plaintiff testified that in proceeding north on North Lee Street, the direction in which he was driving his automobile at the time of the injury, seven railroad tracks are crossed at street level; that parallel with North Lee Street, to the west, some 350 feet distant, is Main Street, which is also crossed at grade by defendant railway company's tracks, the general direction of the tracks being east and west.

The plaintiff described the obstructions to the view looking west from the North Lee Street crossing toward Main Street, as follows: "Between the North Lee Street crossing and the Main Street crossing, there is a coal company chute that runs out to the railroad track and oil tanks are close to the track. There is another building on down close to the railroad track which faces Main Street. I think there are about three buildings, in addition to the oil tanks between Lee Street and Main Street, which look like they are up against the railroad track. The situation in this North Lee Street crossing is now like it was at the time of my injury. Going in a northerly direction there are seven tracks which I had to cross. They are almost in half circle, beginning east of the Vance mill crossing and going west toward the Main Street crossing. At the time of my injury, there was a boxcar on the sidetrack next to the Thomas & Howard building on my left. . . . On the afternoon prior to my injury, when I went over this crossing, going in a southerly direction, I observed on the left a pile of crossties between tracks 5 and 6. This was on my left going in a southerly direction. I also noticed a boxcar next to the Thomas & Howard building; on down the track there were several piles of coal and a coal car. There is a coal chute runs out against the railroad and there was a coal car there. When I came back

that night, going in a northerly direction, I could see this boxcar was still there next to Thomas & Howard. Down the track to my left I could not see as far as the Main Street crossing. I couldn't see distinctly what was down there, but it appeared like those obstacles were still there. In other words, obstacles were down there that prevented me from seeing down there. . . . Down there about where the coal car was there was a coal chute, several piles of coal and just beyond that the Texaco oil tanks and two buildings below that and Main Street."

Plaintiff testified that on the night of the injury, before entering upon the crossing at track 1, he stopped, looked both ways, and neither saw nor heard anything; that the left window of his automobile was down from the top an inch and a half. "It was a cold, cloudy, drizzly day. That night it was foggy and you couldn't see very far ahead of you from the automobile lights. . . . It was foggy, the headlights of my automobile did not throw a light over twenty-five feet. . . . To my left the track comes in almost half circle and the buildings I quoted made it impossible for me to see down to North Main Street." He testified that he proceeded carefully across tracks, 1, 2, 3, 4 and 5; that between tracks 5 and 6 there was a space of 50 feet; that halfway between these tracks he brought his car "almost to a complete stop between tracks 5 and 6." He said, "I came to practically a stop between fifth and sixth tracks. . . . The track curves and the headlight of the engine (on track 6) is thrown to the left of the track. When the train coming (comes) around that curve throwing a light the other way that car, coal piles and those buildings would obstruct your view. At a point 25 feet south of the sixth track I couldn't see a train approaching from the west more than 25 feet on that particular night because of the obstructions I have just described and the weather conditions combined."

Plaintiff testified that before starting to cross track 6 he looked in both directions and did not see or hear anything; that in traversing the short distance to track 6 he was traveling five to ten miles per hour; that he heard no whistle or bell; that he did not see the headlight or the train until it was within 8 feet of him. The front of his automobile was struck by the locomotive of the defendant railway's train coming from the west on track 6, causing injury to himself and to his automobile.

Defendant offered evidence tending to show that there were no obstructions to the view looking west to Main Street from a point 25 feet south of track 6, and that the night of 7 December, 1937, was clear and the weather cold.

Issues addressed to questions of negligence, contributory negligence and damage were submitted to the jury and answered in favor of plaintiff. From judgment predicated on the verdict, defendants appealed.

CALDWELL v. R. R.

*Hayden Clement, R. Lee Wright, and F. Grainger Pierce for plaintiff, appellee.*

*W. T. Joyner and Linn & Linn for defendants, appellants.*

DEVIN, J. 1. Defendant's motion for judgment of nonsuit, on the ground that plaintiff's evidence conclusively showed contributory negligence on his part, was properly denied. From a careful consideration of the evidence in the record before us, viewed in the light most favorable to the plaintiff in accord with the accepted rule on motions of this kind, we are led to the conclusion that it was a case for the jury. *Meacham v. R. R.,* 213 N. C., 609, 197 S. E., 189; *Quinn v. R. R.,* 213 N. C., 48, 195 S. E., 85; *Cole v. Koonce,* 214 N. C., 188, 198 S. E., 637; *Williams v. Express Lines,* 198 N. C., 193, 151 S. E., 197; *Johnson v. R. R.,* 214 N. C., 484, 199 S. E., 704; *Coltrain v. R. R.,* 216 N. C., 263.

2. The defendants assign as error the ruling of the court below in sustaining plaintiff's objection to the testimony of two witnesses as to the result of observations made by them at the Lee Street crossing nearly two years after the injury. One of these witnesses would have testified that at the time of his observation, when the weather conditions were "cloudy but not raining," the headlight of a locomotive coming from the west to the Lee Street crossing could be seen for a distance of 350 feet from a point midway between tracks 5 and 6. The other witness would have testified at the time of his observation, when the weather conditions were "kind of misty," the headlight was visible 80 to 100 feet from the same point. Ordinarily, testimony of witnesses as to observations, under circumstances like those about which testimony has been given, would be considered competent. *S. v. Holland,* 216 N. C., 610. But here it appears that there was a material difference in the atmospheric conditions at the time these witnesses made their observations, in 1939, from the fog which plaintiff testified obscured his vision on the night of the injury in 1937. And it further appears that other witnesses, without objection, had testified to substantially the same effect as that proposed to be offered by these witnesses. There were surveys, maps, photographs and the testimony of several witnesses as to the location and surroundings. The exception to the ruling of the trial judge in excluding the testimony of the two witnesses may not be held for error. *Conrad v. Shuford,* 174 N. C., 719, 94 S. E., 424; *Cook v. Mebane,* 191 N. C., 1, 131 S. E., 407; *Willis v. New Bern,* 191 N. C., 507, 132 S. E., 286; *Wolfe v. Smith,* 215 N. C., 286, 1 S. E. (2d), 815; *Brown v. Montgomery Ward & Co.,* 217 N. C., 368; *S. v. Elder,* 217 N. C., 111; Wigmore on Ev. (2nd Ed.), sec. 442.

3. Defendants assign as error the admission by the trial court of evidence tending to show that the railroad crossing on Lee Street was

peculiarly and unusually hazardous to travelers, and they except to the action of the court in submitting to the jury the question whether under all the circumstances this crossing was unusually hazardous, so as to require the railway company, in the exercise of due care, to erect gates, maintain a flagman, or provide other warning devices at the crossing to avoid injury to those traversing it.

It is apparent that under the allegations in the complaint, and the testimony offered in support thereof, there was no error in submitting to the jury the evidence pertaining to this alleged element of negligent omission of duty on the part of the defendant railway company. *Dudley v. R. R.*, 180 N. C., 34, 103 S. E., 905; *Blum v. R. R.*, 187 N. C., 640, 122 S. E., 562; *Batchelor v. R. R.*, 196 N. C., 84, 144 S. E, 542; *Moseley v. R. R.*, 197 N. C., 628, 150 S. E., 184; *Eller v. R. R.*, 200 N. C., 527, 157 S. E., 800; *Nash v. R. R.*, 202 N. C., 30, 161 S. E., 857; *Harper v. R. R.*, 211 N. C., 398, 190 S. E., 750; *White v. R. R.*, 216 N. C., 79. It is well settled that where a railroad track crosses, at the same level, a public road or street, the law imposes upon the operator of the railroad the duty to give reasonable and timely warning of the approach of a train to the crossing. Ordinarily, at a grade crossing where no unusually dangerous or hazardous conditions exist, timely signals by sounding the bell or blowing the whistle are deemed adequate. But where there are circumstances of more than ordinary danger and where the surroundings are such as to render the crossing peculiarly and unusually hazardous to those who have a right to traverse it, a question of fact is raised for the determination of the jury whether under the circumstances the operator of the railroad has exercised due care in providing reasonable protection for those who use the crossing, and whether the degree of care which the operator of the railroad is required to exercise to avoid injury at grade crossings imposes the duty to provide safety devices at the crossing. It was said in *R. R. v. Ives,* 144 U. S., 408, quoted in *Batchelor v. R. R.,* 196 N. C., 84: "It seems, however, that before a jury will be warranted in saying, in the absence of any statutory direction to that effect, that a railroad company should keep a flagman or gates at a crossing, it must be first shown that such crossing is more than ordinarily hazardous; as, for instance, that it is a thickly populated portion of a town or city; or, that the view of the track is obstructed either by the company itself or by other objects proper in themselves; or, that the crossing is a much traveled one and the noise of approaching trains is rendered indistinct and the ordinary signals difficult to be heard by reason of bustle and confusion incident to railway or other business; or, by reason of some such like cause."

It is a question of due care under the circumstances. The railroad company must use such reasonable care and precaution as ordinary

prudence would indicate.   *R. R. v. Kuhn,* 86 Ky., 578; 22 R. C. L., 990.
Where the conditions existing at or about the crossing are such as to
render the crossing dangerous and hazardous to the traveling public and
tend to render the sounding of whistle or bell on the engine inadequate,
evidence of such conditions is admissible to aid the jury in determining
whether under all the circumstances the railroad company has exercised
due care in giving reasonable and timely warning of the approach of the
train, and it becomes a question for the jury whether the degree of care
which the railroad company is required to exercise to avoid injuries at
crossings imposes the duty to provide additional safety devices.   *Moseley
v. R. R., supra,* 60 A. L. R., 1096.

In *Moseley v. R. R., supra,* it was said: "Where the evidence shows
a railroad crossing is for any reason peculiarly dangerous, it is a question
for the jury whether the degree of care which a railroad company is
required to exercise to avoid accidents at crossings imposes on the com-
pany the duty to provide safety devices at the crossing."

Upon this phase of the case the trial judge instructed the jury as
follows: "Where a railroad crossing is not peculiarly and unusually
dangerous, the exercise of due care on the part of the railroad company
does not require it to provide gates, signal devices, watchman, or other
such safety methods.   However, the exercise of due care on the part of
the railroad company may require the erection of gates or signal device
or the maintenance of a watchman where the crossing is unusually and
peculiarly hazardous.   It is for the jury to say whether the crossing in
question was, under all the circumstances, peculiarly and unusually
hazardous so as to require the railroad in the exercise of due care to
erect gates or signal devices or maintain a flagman or such other means
of warning and safety.   If it should appear that a crossing is a much-
used one and situated in a populous area, those facts standing alone are
not sufficient to constitute such crossing peculiarly and unusually haz-
ardous so as to require the railroad, in the exercise of due care, to pro-
vide gates or signal devices or a watchman or such other means of warn-
ing.   However, peculiar and particular hazard may arise where the
crossing is in a populous community, where it is much used, where there
are conditions such as to obstruct the traveler's view as he approaches
and enters upon the crossing, where there is noise and confusion and
other conditions reasonably calculated to distract the traveler's attention
and prevent him from seeing and hearing an approaching train."

After stating the evidence pertaining to this phase of the case, and
arraying the contentions of both plaintiff and defendants thereon, the
court charged the jury as follows: "The court charges you that if the
plaintiff has satisfied you by the greater weight of the evidence, the
burden being upon the plaintiff, that the crossing in question, referred

to as North Lee Street crossing, was peculiarly and unusually hazardous, and that the railway company failed to provide gates or signal devices or a flagman or other such means of warning, then the court charges you that such failure on the part of the defendant railway company would constitute negligence, and if you further find from the evidence and by its greater weight that such negligence was the proximate cause of the plaintiff's injury and damage, it would be your duty to answer the first issue, yes." . . .

The defendants excepted to that portion of the charge last quoted. In their brief they challenge the correctness of this instruction on the ground that there was no evidence that the crossing was peculiarly hazardous, so as to justify the submission to the jury of the question of absence of gates, or flagman as an element of negligence. It is apparent that the reason assigned in the brief for bringing forward this exception is insufficient and not borne out by the evidence. Hence, consideration of other aspects of this excerpt from the charge might be deemed not required on this record. (Supreme Court Rules 28 and 27½.) However, appellants' exception duly noted should doubtless warrant us in examining the instruction further, and taking note of the omission of reference to due care in the sentence objected to. This clause standing alone would be erroneous, in that it would seem to imply that, upon proof of the unusual hazard of a crossing, the failure to provide gates, signal devices or flagman would itself constitute negligence upon the part of the railroad company, rather than furnishing evidence from which the jury might find the railway company had failed to exercise due care with respect to the use of reasonable and timely warning devices. R. R. v. Perkins, 125 Ill., 127; R. R. v. Ives, supra.

But an examination of the entire charge on this point in which the correct rule was repeatedly stated, in connection with other portions of a clear and accurate charge on the law of negligence and contributory negligence applicable to the evidence in this case, leads us to the conclusion that the jury was not misled or the defendants in any way prejudiced thereby. The appellants in their brief do not contend that the result was influenced by the omission herein pointed out. The point of their objection is that the judge erred in referring to the matter at all, rather than in any omission in the language in which his instructions were couched.

An appellate court, by careful examination, may not infrequently find errors in language used or omitted by the trial judge in his instructions to the jury upon issues of fact, but in accord with a less technical and more liberal conception of the power to review, the court may also, upon due consideration of all the circumstances surrounding the trial and in the light of the matter under investigation, perceive that the errors com-

plained of neither misled the jury nor affected the impartiality of the trial.

"Verdicts and judgments are not to be set aside for harmless error, or for mere error and no more. To accomplish this result, it must be made to appear not only that the ruling complained of is erroneous, but also that it is material and prejudicial, amounting to a denial of some substantial right." *Wilson v. Lumber Co.,* 186 N. C., 56, 118 S. E., 797; *Collins v. Lamb,* 215 N. C., 719, 2 S. E. (2d), 863.

4. We have examined the other exceptions noted and find in them no prejudicial error. The defendants' requests for instructions, embodying applicable principles of law, were substantially given in the general charge on the law of negligence and contributory negligence. *Carter v. R. R.,* 165 N. C., 244, 81 S. E., 321. Those containing requests for peremptory instructions were properly refused. The request that the court instruct the jury to answer the issue of contributory negligence in favor of defendants, unless the jury found the vision of plaintiff was obstructed by fog or mist, ignored the relevancy of the testimony of plaintiff as to other obstructions. The exception to the exclusion of the proffered testimony of a witness as to the contents of his weather report for 7 December, 1937, cannot be sustained. The weather report was admitted in evidence and the witness testified the weather on the 7th and 8th was clear.

After a careful examination of the record in this case, we conclude that the issues of fact raised by the pleadings were fairly submitted to the jury, and that in the trial there was no error which should warrant us in setting aside the verdict and judgment of the Superior Court.

No error.

CLARKSON, J., concurring: I concur in the logical and well-written opinion of *Justice Devin.* As I have read with care the record, I set forth the evidence fully and the law applicable to the facts. The dissenting opinion, I think, is meager of facts and deals in technicalities and generalities. I also give much of the charge of the court below— in my opinion perhaps few cases have been tried more ably and carefully.

This is an action for actionable negligence alleging damage, brought by plaintiff against defendant, for injuries sustained at a railroad crossing of defendant company in the city of Salisbury, N. C.

It is well settled that an exception to a motion to nonsuit in a civil action taken after the close of plaintiff's evidence, and renewed by defendant after the introduction of his own evidence, does not confine the appeal to the plaintiff's evidence alone, and a verdict will be sustained under the second exception if there is any evidence on the whole record of the defendant's negligence. The evidence favorable alone to

the plaintiff is considered—defendants' evidence is discarded. The competency, admissibility and sufficiency of evidence is for the court to determine, the weight, effect and credibility is for the jury.

The plaintiff testified, in part: "I have been living in Salisbury since 1932. In going from the freight depot in Salisbury, North Lee Street is used. The freight depot of the Southern Railway Company is about 200 yards from this crossing. In going to the warehouse, North Lee Street is used. In going from Salisbury to the Cartex Cotton Mill and to this warehouse, North Lee Street crossing is used. The Thomas & Howard building adjoins this crossing on the west side. This is a brick building about 30 feet tall and approximately 100 feet long. This building goes up within a few feet of one of the spur tracks. This building runs parallel with the railroad tracks in a westerly direction for a distance of approximately 100 feet. Between the North Lee Street crossing and the Main Street crossing, there is a coal company chute that runs out to the railroad track and oil tanks are close to the track. There is another building on down close to the railroad track which faces Main Street. I think there are about three buildings, in addition to the oil tanks between Lee Street and Main Street, which look like they are up against the railroad track. The situation at this North Lee Street crossing is now like it was at the time of my injury. Going in a northerly direction there are seven tracks which I had to cross. They are almost in a half circle, beginning east of the Vance mill crossing and going west toward the Main Street crossing. . . . I came to the railroad crossing at Thomas & Howard's. There was a boxcar to my left on the Thomas & Howard sidetrack. I had to come to a complete stop because you couldn't see anywhere ahead of you. On my right and next to the railroad was a big truck. *I looked both ways, to the left and right. It was a cold, cloudy, drizzly day. That night it was foggy and you couldn't see very far ahead of you from your automobile lights. I stopped within ten feet of the railroad crossing, looked both ways, didn't see or hear anything and drove on across the tracks. I stopped for several seconds before starting across the track. You could not see anywhere to my left and towards the west, from the point at which I stopped because the building obstructed my view and the boxcar was next to it.* I started across the tracks with my car in low gear, driving slowly and looking both to the right and left. There is a space of approximately 50 feet between the fifth and the sixth tracks. I drove about halfway of that distance and *brought my car almost to a complete stop and looked to the west and also towards my right. I didn't see or hear anything. I did not hear any whistle or bell ringing.* On the right-hand side of the space which I have described, up against the track and beside a telephone pole was a stack of crossties, 8 or 10 feet high. To my left the

track comes in almost half circle and the buildings I quoted a minute ago made it impossible for me to see down to the North Main Street crossing. I brought my car almost to a complete stop in the space which I have described. It was in low gear, pulled the car up there and slowed it down. *It was foggy and you couldn't see but a few feet ahead of you and when I didn't see anything, looking in both directions, I shoved the car in second gear and proceeded across the tracks. When my automobile got about halfway across track No. 6, the train was within 6 feet of me, because it hit me just as I saw it.*

"I could not see over 25 feet that night on account of the condition of the weather. *It was foggy, the headlights of my automobile did not throw a light over 25 feet and the train was coming from the west. Because of the curvature of the track, the engine headlight is thrown to the north of the track.* When I started to cross the last two tracks the speed of my car was between 5 and 10 miles an hour. *After I crossed the fifth track I could not see far enough down to my left to see anything. I didn't see anything after I crossed the fifth track and I was looking. I was hurt on the sixth track, which is a good little piece from the fifth track. The engine struck my automobile at the left door on the driver's side and carried me down the track 50 or 60 feet.* The train went at least that much farther. I would say that the train was running 30 or 35 miles an hour when it struck me because it was about 8 feet of me when I saw it and it hit me like that. (Witness snaps finger.) When I was between tracks 5 and 6 looking to the west, *there was something that hindered me from seeing very far down the track. I don't know whether it was a coal car, pile of coal at the chute, or an oil tank at the Texaco service place, and the condition of the weather too.* . . .

"On the afternoon prior to my injury, when I went over this crossing, going in a southerly direction, I observed on the left a pile of crossties between track 5 and 6. This was on my left going in a southerly direction. I also noticed a boxcar next to the Thomas & Howard building; on down the track there were several piles of coal and a coal car. There is a coal chute runs out against the railroad and there was a coal car there. When I came back that night, going in a northerly direction, I could see this boxcar was still there next to Thomas & Howard. Down the track to my left I could not see as far as the Main Street crossing. I couldn't see distinctly what was down there, but it appeared like those obstacles were still there. I could not say the boxcar was still there. *In other words, obstacles were down there that prevented me from seeing down there.* . . . *When the train coming around that curve throwing a light the other way that car, coal piles and those buildings would obstruct your view.* At a point 25 feet south of the sixth track I

couldn't see a train approaching from the west more than 25 feet on that particular night because of the obstructions I have just described, and the weather conditions combined. If there hadn't been any fog, I couldn't say how far I could have seen. On that night I couldn't see the headlight of the engine or the lighted cars more than 25 feet. . . . I didn't see any light, didn't hear any noise and didn't know anything about the train being on the track until it was within 8 feet of me."

At the request of counsel for the defendants, concurred in by counsel for plaintiff, *the jury was allowed to review the crossing in question.* Accompanied only by the sheriff of the county and the judge presiding, the jury viewed the premises in accordance with an order of the court, agreed to by the parties to the action.

C. Y. Kirk testified, in part: "I don't remember hearing any whistle or bell before the crash. . . . It was a misty night. . . . I was in position to hear the whistle or bell rung on that train. I did not hear any. *Where I was working was about 75 feet from the crossing.*"

Henry Fox testified, in part: "It had been raining and was foglike. I remember that because the top of the truck was wet. I had not seen or heard the train before the collision. *I was in about 75 feet of the crossing and was in position to hear the train whistle or bell. I did not hear the whistle or bell or any other sound.* I did not see Mr. Caldwell before the collision. I ran down to the train with Cleophus Kirk. Somebody helped me get Mr. Caldwell out of the car. He was taken to the hospital."

B. E. Altman testified, in part: "I remember the weather on the night of December 7, 1937. It was somewhat foggy and misty."

Homer Lingle testified, in part: "I reside in Salisbury. I saw Mr. Caldwell's car at the Salisbury Motor Company the day following the collision. It was damaged on the left side between the door and the hood, where the driver sits. The front of the car was not damaged. I am familiar with Lee Street crossing in Salisbury. *In my opinion 300 or 400 cars cross over it a day. That estimate is based on my use of the crossing.*"

C. V. Kirkman, a witness for defendants, testified, in part: "Track No. 1, as shown on the blueprint, is used as a storage track for Thomas & Howard. Track No. 2 serves the Texaco Oil Company and the Henderlite Coal Company. Track No. 3 is used to operate train on. It is a 'Y' track. Tracks 4 and 5 are team tracks used for the loading and unloading of freight at the freight depot. *Track No. 6 carries eastbound traffic and Track No. 7 westbound traffic. Track No. 3 is kept open for the operation of trains. We operate three passenger trains over it a day between Salisbury and Asheville.* That was true in 1937 as well as today. (Cross-examination.) *Five passenger trains* are

CALDWELL *v.* R. R.

operated over Tracks 6 and 7 every 24 hours. *Six or seven freight trains are operated over Tracks 6 and 7 a day.* Track No. 1 also serves an oil company, as well as Thomas & Howard. *Lee Street crossing is constantly used by the public day and night.* (Q.) Please state whether or not on the 7th day of December, 1937, the Lee Street crossing was equipped with any electric gong, signal, night watchman or gates, or any other device to warn the traveling public of the approach of trains? Ans.: *There was no device at the crossing. There was no stationary device or night watchman."*

J. E. Alexander testified, in part (on cross-examination): *"Lee Street crossing is constantly and habitually used by the public as a thoroughfare day and night."*

The court below charged the jury: "Negligence, gentlemen of the jury, *is the doing of some act which a man of ordinary care and prudence would not do under the same or similar circumstances. It is or may be the failure to do some act which a man of ordinary care and prudence would do under the same or similar circumstances.* But every negligent act, gentlemen of the jury, is not a ground for recovery of damages. Before a negligent act may be a ground for the recovery of damages it must be what the law terms actionable negligence, that is to say, it must be the proximate cause of the injury and damage. Now by proximate cause is meant what that term implies, the real cause, the efficient cause, the cause, unbroken by any intervening agent, produces the result in continuous and natural sequence, the cause without which the injury would not have happened or occurred, and one from which a person of ordinary prudence could reasonably foresee that injury would result. *You will bear that definition in mind, gentlemen of the jury, throughout the trial."* Contributory negligence was also correctly defined in the charge.

The court below further charged the jury: "Where a railroad track crosses a public highway both a traveler and a train operated upon the railroad have equal rights to cross. But the traveler must yield the right of way to the train in the ordinary course of the operation of trains. While the train has the right of way at a crossing, it is the duty of the engineer and those in charge of its operation to exercise due care in keeping a proper lookout for danger and to give timely signals and warning in approaching such crossing. When approaching a public crossing the employees in charge of a train and a traveler upon a highway are charged with the mutual and reciprocal duty of exercising due care to avoid inflicting or receiving injury, due care being such as a prudent person would exercise under the circumstances at the particular time and place. Both parties are charged with the mutual duty of keeping a careful lookout for danger, and the degree of diligence to be used

CALDWELL *v.* R. R.

on either side is such as a prudent man would exercise under the circumstances of the case in endeavoring to perform his duty. On reaching the crossing and before attempting to go upon it, the traveler must use his sense of sight and hearing—must look and listen for approaching trains, if not prevented from doing so by fault of the railway company; and this he should do before entering the zone of danger. A traveler has the right to expect timely warning, but the failure to give such warning will not justify the traveler in relying solely upon such failure or in assuming that no train is approaching. It is still his duty to exercise due care for his own safety by keeping a proper lookout. A traveler on the highway, before crossing a railroad track, as a general rule, is required to look and listen to ascertain whether a train is approaching, and the mere omission of the train to give signal by bell or whistle will not relieve him of this duty. A railroad track is a place of danger and a traveler entering upon such track at a crossing does so with knowledge of its danger. *Where crossing danger is increased because of atmospheric conditions, such as fog or mist, such increase of hazard requires increased attention on the part of the traveler,* and also requires increased effort and attention on the part of operators of the train in giving warning. The standard of care required of both remains the same, that is, the care which a reasonably prudent person would have exercised under the same circumstances, but the increased attention and effort required of the traveler in keeping a proper lookout for his own safety and the increased effort and attention required of the railroad in giving timely warning, are commensurate with the increase of the hazard. Where a railroad crossing is not peculiarly and unusually dangerous, the exercise of due care on the part of a railroad company does not require it to provide gates, signal devices, watchman, or other such safety methods. *However, the exercise of due care* on the part of the railroad company may require the erection of gates or signal device or the maintenance of a watchman where the crossing is unusually and peculiarly hazardous. (A) It is for the jury to say whether the crossing in question was, under all the circumstances, peculiarly and unusually hazardous *so as to require the railroad in the exercise of due care, to erect gates or signal devices or maintain a flagman or such other means* of warning and safety. (B)—(To the foregoing portion of his Honor's charge embraced between the letters (A) and (B) the defendants except and assign error.) *If it should appear that a crossing is a much-used one and situated in a populous area, those facts standing alone are not sufficient to constitute such crossing peculiarly and unusually hazardous so as to require the railroad, in the exercise of due care,* to provide gates or signal devices or a watchman or such other means of warning. *However, a peculiar and particular hazard may arise* where the crossing is in

a populous community, where it is much used, where there are conditions such as to obstruct the traveler's view as he approaches and enters upon the crossing, where there is noise and confusion and other conditions reasonably calculated to distract the traveler's attention and prevent him from seeing and hearing an approaching train. *Gentlemen of the jury, you will bear those definitions and those rules in mind throughout the trial and apply the evidence to those principles of law.*"

After giving the contentions of both sides carefully and accurately, to which no objection was made, the court below further charged the jury: "Now, gentlemen of the jury, you will consider the contentions of both sides and the evidence of both sides, and apply the evidence to the rules of law, holding in mind the contentions made by counsel and any contentions which reasonably arise upon the evidence. If the plaintiff has satisfied you, gentlemen of the jury, by the greater weight of the evidence, the burden being upon the plaintiff, that the defendants, in the operation of Southern Train No. 12 on the occasion referred to, December 7, 1937, *failed to exercise due care* in giving adequate and timely warning of the approach of the train to the crossing on North Lee Street, and if the jury shall further find from the evidence and by its greater weight that such failure was the proximate cause of the plaintiff's injury and damage, then, upon such findings by the greater weight of the evidence, the burden being upon the plaintiff, the court charges you that it would be your duty to answer the first issue 'Yes.' If you fail to so find (nothing else appearing), it would be your duty to answer the first issue 'No.' The first issue being, 'Was the plaintiff injured and damaged by the negligence of the defendants, as alleged in the complaint?' The plaintiff further contends, gentlemen of the jury, that the defendants were negligent, in that the plaintiff says and contends that North Lee Street crossing was peculiarly hazardous and unusually dangerous and that *the exercise of due care on the part of the defendants required the erection and maintenance of some warning device, such as signals, gates or a watchman.* The plaintiff says and contends that the street is a much-used street, that it is one of the main arteries of traffic, that it is one of the thoroughfares in the city, and that Salisbury is a city of considerable size. Plaintiff says and contends that traffic is upon the street day and night and that it is of a continuous nature, and that several hundred cars pass over the street during the day and night; that the street crossing is in close proximity to the freight depot and to a certain cotton mill, and to other sections of the town requiring traffic. *The plaintiff says and contends that the street crossing is over seven tracks; that buildings are in close proximity to the tracks, and that the tracks to the left, that is, in a westerly direction, are not straight, but that they are curved, and that, because of the curve and because of*

*certain physical structures there, the approach of a train cannot be seen in close proximity to the crossing, and that it is unusually dangerous and particularly hazardous because of the curves, because of the obstructed vision, and because of certain noise which generally prevails there.* The plaintiff says and contends that you should be satisfied by the greater weight of the evidence that, on account of the conditions there, the traveler's opportunity to see and hear an approaching train is interfered with, and interfered with to such an extent that it is peculiarly hazardous. *The defendants say and contend to the contrary. The defendants say and contend that it is not a peculiarly and unusually hazardous crossing.* Defendants say and contend that a limited number of trains pass over the crossing from day to day, and that the crossing is of sufficient width to take care of the traffic, and that there is sufficient distance in approaching the main lines, both from the north and south, to enable one to stop, look and listen, without going on, irrespective of other tracks, and that the tracks are straight, or practically straight, and that the headlight could be seen a considerable distance; that there is no congestion, that the area is not sufficiently populous, and there are no sufficient noises to constitute a peculiar hazard. Now, gentlemen of the jury, it is a matter for you to say from the evidence as to what the truth is, and you will bear in mind all the evidence, the contentions of the parties made, and any contention which may arise upon the testimony. (C) The court charges you that if the plaintiff has satisfied you by the greater weight of the evidence, the burden being upon the plaintiff, that the crossing in question referred to as North Lee Street crossing, was peculiarly and unusually hazardous, and that the railroad company failed to provide gates or signal devices or a flagman or other such means of warning, then the court charges you that such failure on the part of the defendant railway company would constitute negligence, and if you further find from the evidence and by its greater weight that such negligence was the proximate cause of the plaintiff's injury and damage, it would be your duty to answer the first issue 'Yes.' (D)—(To the foregoing portion of his Honor's charge embraced between the letters (C) and (D), the defendants except and assign error.) If you fail to so find (nothing else appearing), it would be your duty to answer the first issue 'No.' Upon that issue as it relates to the question of signals or question of gates, the plaintiff says and contends that you should be satisfied by the greater weight of the evidence, first, that there were no gates or warning devices there, in the nature of gates or signal devices, and that if such gates or warning devices had been erected there, that he would not have received his injury. He says and contends that you should be satisfied by the greater weight of the evidence that such failure was, first negligence on the part of the defendant railway company, and that

such negligence was the proximate cause of his injury. Defendants say and contend, gentlemen of the jury, that you should not be so satisfied. Defendants say and contend, in the first place, that the crossing was not peculiarly hazardous and that, not being peculiarly hazardous, it was under no obligation to place gates or signals or station a watchman there; that it was open where the train could be seen going and coming in both directions, and that the plaintiff was in a position to see and know of the approach of the train, by the exercise of due care. Defendants say and contend that it committed no breach of duty and was not negligent in any respect, and say and contend that you should answer the first issue 'No.' You will bear in mind all the contentions and all the evidence as it relates to the issue."

As to whether it was negligence of defendant Southern Railway Company to fail to provide gates or signal devices or a flagman under the conditions prevailing at the crossing, the court below charged the rule of due care: (1) In the definition of "negligence," "ordinary care and prudence," and "proximate cause," and charged, "You will bear that definition in mind, gentlemen of the jury, *throughout the trial.*" (2) "Where a railroad crossing is not peculiarly and unusually dangerous, *the exercise of due care on the part of a railroad company does not require it to provide gates, signal devices, watchman, or other such safety methods. However, the exercise of due care* on the part of the railroad company may require the erection of gates or signal device or the maintenance of a watchman where the crossing is unusually and peculiarly hazardous." (3) "It is for the jury to say whether the crossing in question was, under all the circumstances, *peculiarly and unusually hazardous so as to require the railroad in the exercise of due care,* to erect gates or signal devices or maintain a flagman or such other means of warning and safety." (4) "It would appear that the crossing is a much-used one and situated in a populous area, those facts standing alone are not sufficient to constitute such crossing peculiarly and unusually hazardous so as to require the railroad, *in the exercise of due care, to provide gates or signal devices or a watchman or such other means of warning.* However, peculiar and particular hazard may arise," etc. (5) "The plaintiff further contends, gentlemen of the jury, that the defendants were negligent in that the plaintiff says and contends that North Lee Street crossing was peculiarly hazardous and unusually dangerous, *and that the exercise of due care on the part of the defendant required the erection* and maintenance of some warning device, such as signals, gates or a watchman."

I give the charge fully. The court below defined negligence and instructed the jury that *they should bear the definition in mind throughout the trial.* Four other times the court below used the words "in the

exercise of due care" in reference to gates, signal devices and watchman. There was no conflict anywhere in the charge, and the matter complained of was the omission to repeat what had been previously charged many times.

The general principles applicable are thus stated: Instructions must be considered as a whole, and if, as a whole, they state the law correctly, there is no reversible error, *although a part of the instructions considered alone may be erroneous.* Portions of a charge, which considered alone, are objectionable, *are not erroneous,* if, when construed with the whole charge, the objections are not apparent. The instructions must be *considered as a whole,* and, if it appears that the jury was *fairly and fully instructed* on all the law applicable to the case, the judgment will not be reversed because the particular instruction *taken alone may not have embodied all the law applicable.* 32 N. C., and S. E. Digest, p. 640, secs. 295 (2) and 295 (3).

The dissenting opinion says: "This charge as given constitutes a statement that it is negligence *per se* for a railroad company to fail to maintain gates or signaling devices or a flagman at a crossing which is peculiarly and unusually dangerous, without regard to the principle of due care and without reference to whether an adequate and timely signal has been given by bell and whistle." The record does not bear out this statement. The court below did not charge it was negligence *per se.* After charging *five times* the rule of due care, it omitted it in the portion set forth in the dissenting opinion. *Nowhere in the brief of defendant* is the position taken that is set forth above in the dissenting opinion. We find it only in the dissenting opinion. The dissenting opinion takes exception to that which defendants did not. The exception of defendants, as set forth in the charge, was as follows: *"Defendants say and contend, gentlemen of the jury, that you should not be so satisfied. Defendants say and contend, in the first place, that the crossing was not peculiarly hazardous and that, not being peculiarly hazardous, it was under no obligation to place gates or signals or station a watchman there;* that it was open where the train could be seen going and coming in both directions, and that the plaintiff was in a position to see and know of the approach of the train, by the exercise of due care. Defendants say and contend that it committed no breach of duty and was not negligent in any respect, and say and contend that you should answer the first issue 'No.' You will bear in mind all the contentions and all the evidence as it relates to the issue."

In the defendants' brief is the following: "III. Did the court erroneously admit evidence as to the absence of gongs, gates or watchmen at the crossing, and in permitting the jury to consider the absence thereof on the first issue?" The brief says: "We respectfully argue that the

crossing in question is not a peculiarly hazardous one and is such an intersection as is commonly to be found in any growing community."

In the dissenting opinion we find: "On this phase of the first issue it is that part of the charge expressly required by statute, C. S., 564—the discretion and explanation of the law arising on the evidence—and constitutes the chart the jury was required to follow in arriving at its verdict."

Here we have no exception or assignment of error to the charge made by defendants, but C. S., 564, which is as follows (*ex mero motu* is taken to base a dissent on): "No judge, in giving a charge to the petit jury, either in a civil or criminal action, shall give an opinion whether a fact is fully and sufficiently proven, that being the true office and province of the jury; but he shall state in a plain and correct manner the evidence given in the case and declare and explain the law arising thereon."

The policy of the State differs from the Federal rule and the rule in most states, and the section has been the subject of much criticism.

In the present action, a long trial, the charge is so free from error and carefully given that defendants made no exception or assignment of error to same, except that the court below should not have left it to the jury on the question of negligence as to not providing gates, signal devices, watchman or other such safety methods. Usually a litigant who can find no prejudicial or reversible error cries out C. S., 564. Madame Roland, a famous French lady during the French Revolution, when on the scaffold, looking at the statue to Liberty which stood there, said bitterly, "Oh, liberty, what crimes are committed in thy name." I might paraphrase this quotation by saying: "Oh, C. S., 564, what injustice, by technical, attenuated and cloistered reasoning, is committed in thy name." A court should be slow to "pick up" C. S., 564, to overthrow a verdict of a jury—the "palladium of our civil rights," the rock on which free and orderly government is founded.

In *Dudley v. R. R.,* 180 N. C., 34 (36), it is said: "It was not error for the court to permit the plaintiffs to offer evidence that there was no automatic alarm, or gates, at the crossing, and the court properly left it to the jury to say, upon all the attendant circumstances, whether the railroad company was negligent in not erecting gates. It was incumbent upon the defendant to take such reasonable precautions as were necessary to the safety of travelers at public crossings. 22 R. C. L., 988. This was a question of fact for the jury."

In *Blum v. R. R.,* 187 N. C., 649-650, is the following: "Upon careful examination, we find no error in the instructions to this matter, which is fully discussed in *R. R. v. Ives,* 114 U. S., 408, where it is said that the general rule is 'well stated' in *R. R. v. King,* 86 Ky., 589, as follows: 'The doctrine with reference to injuries to those crossing the track of a

CALDWELL v. R. R.

railway, where the right to cross exists, is that the company must use such reasonable care and precaution as ordinary prudence would indicate.' It also quotes *R. R. v. Perkins,* 125 Ill., 127, where it was held that 'the fact that a statute provides certain precautions will not relieve a railway company from adopting such other measures as public safety and common prudence dictate. And in *Thompson v. R. R.,* 110 N. Y., 636, where it was held that giving the signals required by law by a railroad train approaching a street crossing does not, under all circumstances, render the railway company free from negligence,' citing also, *R. R. v. Commonwealth,* 13 Bush., 388; *Weber v. R. R.,* 58 N. Y., 451, and concludes as follows: 'The reason for such ruling is found in the principle of the common law that every one must so conduct himself and use his own property as that, under ordinary circumstances, he will not injure another in any way. As a general rule, it may be said that, whether ordinary care or reasonable prudence requires a railroad company to keep a flagman stationed at a crossing that is especially dangerous, is a question of fact for the jury to determine, under all the circumstances of the case, and that the omission to station a flagman at a dangerous crossing may be taken into account as evidence of negligence,' adding that where the crossing is a much-traveled one, and the noise of approaching trains is rendered indistinct and the ordinary signals difficult to be heard, by reason of the bustle and confusion incident to railway or other business, or by reason of some such like cause, a jury would be warranted in saying that the railway company should maintain these extra precautions at ordinary crossings in the country, citing numerous authorities. That case has been cited and approved on this point by numerous cases since, which held 'a railroad is not excused for negligence by mere compliance with statute; it must take necessary precautions.' 15 Rose's Notes, 1213, and cases there cited; and *R. R. v. Dandridge, supra* (171 Fed., 74 [U. S. C. C. A.]), and cases citing the same. Indeed, upon the evidence in this case, it would seem that the jury could have had no doubt, if the matter had not been withdrawn from their consideration, that if an automatic gong had been installed at this place it would have given such notice to the plaintiff's testator and his companion that it would have prevented this accident; at least, they would have been justified in drawing the inference that the failure to do so was negligence on the part of the defendants."

In *Nash v. R. R.,* 202 N. C., 30 (32), it is written: "Much evidence was offered by the plaintiff to the effect that the crossing was a populous and much used crossing, and that the defendant had maintained no watchman, gate or other signal device for the protection of the public. . . . (p. 33) The evidence of plaintiff and the inference which such evidence warrants, classify this case in the line of decisions represented

by *Moseley v. R. R.,* 197 N. C., 628; *Thurston v. R. R.,* 199 N. C., 496; and *Butner v. R. R.,* 199 N. C., 695."

In *Moseley v. R. R.,* 197 N. C., 628 (637), it is said: "The mere absence of a statute requiring a flagman or watchman at crossings will not, however, of itself relieve the railroad company from the duty to maintain one, and where a crossing is so peculiarly dangerous that the reasonable safety of the traveling public requires the presence of a flagman or other extraordinary means to signal the approach of the trains, it is incumbent upon the railroad company to employ such means. It is for the jury to say whether under all the circumstances of a particular case the railroad has been guilty of negligence in not maintaining a flagman or watchman at a particular crossing."

The principle in the above authorities is approved in the recent case of *Harper v. R. R.,* 211 N. C., 398. The law on this subject is so well settled in the interest of life and limb, why unsettle it on a supposed technicality—as is attempted in the dissenting opinion?

In Elliott on Railroads, 3rd Ed., part sec. 1584, p. 408, is the following: "Crossings are sometimes safeguarded by means of bells which are caused to sound by a current of electricity set in motion by approaching trains when within a given distance of the crossing. *This method is regarded as effective for the purpose and is likely to come into general use.*" (Italics mine.)

The railroad companies are to be commended that since the building of our great system of hard-surfaced and dependable highways in the State, almost everywhere they have installed electric signals at dangerous crossings with the words "stop on red signal" on them.

In the above cited cases the law is well settled in this State.

On the second issue the dissenting opinion holds it error that the following instruction was not given: "The court charges the jury that the jury should answer the second issue 'Yes,' unless the jury finds that the vision of the plaintiff was obstructed by fog or mist." The evidence of plaintiff was: "I could not see over 25 feet that night *on account of the condition of the weather. It was foggy, the headlights on my automobile did not throw a light over 25 feet and the train was coming from the west. Because of the curvature of the track, the engine headlight is thrown to the north of the track.* When I started to cross the last two tracks the speed of my car was between 5 and 10 miles an hour. After I crossed the fifth track I could not see far enough down to my left to see anything. I didn't see anything after I crossed the fifth track and I was looking. I was hurt on the sixth track, which is a good little piece from the fifth track. . . . When I was between the 5 and 6 track *looking to the west there was something that hindered me from seeing very far down the track. I don't know whether it was a coal car,*

*pile of coal at the chute, or an oil tank at the Texaco service place, and the condition of the weather, too."*

The instruction was substantially given and correct from plaintiff's testimony, as follows: "A railroad track is a place of danger and a traveler entering upon such track at a crossing does so with knowledge of its danger. *Where crossing danger is increased because of atmospheric conditions, such as fog and mist, such increase of hazard requires increased attention on the part of the traveler, and also requires increased effort and attention on the part of operators of the train in giving warning.* The standard of care required of both remains the same, that is, the care which a reasonably prudent person would have exercised under the same circumstances, but the increased attention and effort required of the traveler in keeping a proper lookout for his own safety and the increased effort and attention required of the railroad in giving timely warning, are commensurate with the increase of the hazard."

In the dissenting opinion it is said: "The court excluded certain evidence of experiments made by witnesses to ascertain whether an approaching train could have been seen in the nighttime by a person between tracks 5 and 6 under atmospheric conditions similar to those testified to by witnesses." This statement "under atmospheric conditions similar to those testified to by witnesses" is incorrect. There is no evidence in the record showing similarity of atmospheric conditions. Defendants introduced F. S. Cline, and his testimony excluded was: "The night was cloudy but it was not raining." J. W. Carpenter's testimony was excluded: "It was a kind of misty rain." The plaintiff's evidence was that "The night was foggy"; "It had been raining and was fog-like," and "It was somewhat foggy and misty."

In 1 Wigmore on Evidence, 2nd Ed., p. 782, the rule is thus succinctly stated: "The similarity that is required is, in short, a similarity in essential circumstances, or, as it is usually expressed, a *substantial similarity, i.e.,* a similarity in *such circumstances or conditions as might supposedly affect the result in question."*

The question of a "foggy night" is vastly different from a "cloudy night" or "misty night." It is a matter of common knowledge that automobiles are now equipped, when desired, with special "fog lights."

An appellate court, by careful examination, may not infrequently find errors in language used or omitted by the trial judge in his instructions to the jury, upon pure issues of fact, but in accord with a less technical and more liberal conception of the power to review, the court may also, upon due consideration of all the circumstances surrounding the trial and the light of the matter under investigation, perceive that the errors complained of neither misled the jury nor affected the impartiality and fairness of the trial.

CALDWELL *v.* R. R.

In *In re Ross,* 182 N. C., 477 (478), is the following: "Our system of appeals, providing for a review of the trial court on questions of law, is founded upon sound public policy, and appellate courts will not encourage litigation by reversing judgments for slight error, or for stated objections, which could not have prejudiced the rights of appellant in any material way. *Burris v. Litaker,* 181 N. C., 376; *In re Eden's Will, ante,* 398, and cases there cited. Again, error will not be presumed; it must be affirmatively established. The appellant is required to show error, and he must make it appear plainly, as the presumption is against him. *In re Smith's Will,* 163 N. C., 464; *Lumber Co. v. Buhmann,* 160 N. C., 385; *Albertson v. Terry,* 108 N. C., 75. See, also, 1 Michie Digest, 695, and cases there cited under title 'Burden of Showing Error.'"

The court below tried the case with unusual care and ability and applied the law applicable to the facts. After an extensive and thorough investigation of the law and facts, I can see no prejudicial or reversible error and think the judgment of the court below should be sustained, and I concur in the main opinion.

BARNHILL, J., dissenting: In considering the evidence of the plaintiff as to obstructions existing as he approached the crossing where the accident occurred it is necessary to bear in mind that he was speaking as of the time he approached the first track. This is clearly demonstrated by his own evidence.

Viewing these seven tracks from a northerly to a southerly direction they spread out fan-like so that at the Lee Street crossing there is a space of more than 131 feet from track No. 1 to track No. 7. The distance from the center of track No. 5 to the center of track No. 6 is more than 68 feet and the plaintiff admitted that the distance between the two tracks was at least 50 feet.

Plaintiff testified that there was nothing on tracks Nos. 2, 3, 4, or 5 and nothing in the space between tracks 5 and 6 except a pole with a crossarm warning sign; that in the daytime a person between tracks 5 and 6 could see at least 400 feet to the north from whence the train came. That this is true is demonstrated by the map and the photographs which appear as exhibits in the case. The correctness of these is not challenged by the plaintiff. We should likewise bear in mind that tracks 6 and 7 to the north are practically straight.

The train which struck the plaintiff stopped at the Main Street crossing and was required to stop at the first crossing east of Lee Street, and there is no evidence of excessive speed of the train at the time of the collision. In fact, the plaintiff admitted that after the collision the train stopped within 50 or 60 feet.

The court excluded certain evidence of experiments made by witnesses to ascertain whether an approaching train could have been seen in the nighttime by a person between tracks 5 and 6 under atmospheric conditions similar to those testified to by witnesses. This evidence was competent and should have been admitted. Its exclusion was error. *Arrowood v. R. R.,* 126 N. C., 632; *S. v. Young,* 187 N. C., 698, 122 S. E., 667; *Willis v. New Bern,* 191 N. C., 507, 132 S. E., 286; 22 C. J., 755. It is true that other evidence of observations was admitted. This "other evidence" came from the plaintiff. He was permitted to testify that he went back to the crossing 12 or 15 times to make observations and without first describing the weather conditions at the time the observations were made. He testified that "looking toward Main Street crossing you couldn't see the head of the engine until it got at least halfway between the North Main Street crossing and this (Lee) crossing." The error of the court in excluding this testimony tendered by the defendant is emphasized by the fact that it permitted the plaintiff to testify to such experiments under these conditions. The court might just as well have said to the jury, "The plaintiff has testified as to experiments made in the nighttime to determine whether an approaching train could be seen. The court will not permit this testimony to be contradicted."

But, even if the "other evidence" had come from witnesses for the defendant—and the record does not so disclose—the exclusion of this evidence was erroneous.

The rule applies when the same witness gave substantially the same testimony without objection in other portions of his examination, *Baynes v. Harris,* 160 N. C., 307, 76 S. E., 230; *Eaves v. Coxe,* 203 N. C., 173, 165 S. E., 345; *S. v. Dickey,* 206 N. C., 417, 174 S. E., 316. As said by *Brogden, J.,* speaking for the Court in the *Eaves case, supra:* "Obviously if a party offers the competent testimony of a given number of witnesses, but the court excludes the testimony of one, even though the testimony of the others is admitted without objection, notwithstanding the offering party is entitled to the credibility and weight of testimony of the excluded witness. Otherwise the total weight and credibility of the testimony would be reduced for the reason that a jury might have believed the testimony of witness whose evidence was excluded and for one reason or another might not believe testimony of the witnesses whose testimony was received without objection. Hence it cannot be said as a matter of law that the exclusion of such testimony was harmless error." Approved in *S. v. Dickey, supra.*

The majority concedes the competency of the evidence. The authorities are to the effect that its exclusion was harmful.

The plaintiff, having admitted that there was no obstruction between tracks 5 and 6, testified, "I could not see over 25 feet that night on

account of the condition of the weather, it was foggy, the headlights of my automobile did not throw a light over 25 feet and the train was coming from the west . . . in that space of 50 feet, as you say, from track 5 to track 6 all the way up to your left, the direction from which the train was coming, there was no obstruction except a railroad crossing signal . . . I don't know what kept me from seeing. There was some obstruction of some kind. It was cloudy all day, it rained some that day and it was foggy that night. In the open area within 25 feet from this to the left there wasn't anything. When I was within 25 feet of the track there was nothing but the fog . . . at that time I was going 5 or 10 miles per hour and could have stopped my car in 10 feet. . . . I don't know what kept me from seeing it (the head-light). I didn't see it. I never did see the headlight." He also admitted that he told defendant's agent that fog obstructed his view.

On the second issue, as to the contributory negligence of the plaintiff, the defendant, basing its request upon the foregoing evidence and like evidence offered by the defendant, prayed the court to instruct the jury as follows:

"The court charges the jury that the jury should answer the second issue 'Yes,' unless the jury finds that the vision of the plaintiff was obstructed by fog or mist."

The substance of the instruction should have been given. On the plaintiff's own evidence, if there was no fog to obstruct his vision, he admittedly drove in front of an oncoming train which, by the exercise of ordinary care, he could have seen but for the atmospheric conditions about which he complains. *Meacham v. R. R.*, 213 N. C., 609, 197 S. E., 189. This view of the defendant's defense the court wholly failed to present to the jury. Its failure to do so was error substantially harmful to the defendant.

In this connection it may be well to note that plaintiff testified that with the benefit of the lights of his automobile, which were in good condition, looking forward he could not see more than 25 feet. How then could he have seen an obstruction to the left without the aid of any light? When a witness makes a statement of fact which is obviously impossible it does not rise to the dignity of evidence.

On the first issue as to the negligence of the defendant the court first charged the jury:

"If the plaintiff has satisfied you, gentlemen of the jury, by the greater weight of the evidence, the burden being upon the plaintiff, that the defendants, in the operation of Southern Train No. 12 on the occasion referred to, December 7, 1937, failed to exercise due care in giving adequate and timely warning of the approach of the train to the crossing on North Lee Street, and if the jury shall further find from the evidence

and by its greater weight that such failure was the proximate cause of the plaintiff's injury and damage, then, upon such findings by the greater weight of the evidence, the burden being upon the plaintiff, the court charges you that it would be your duty to answer the first issue 'Yes.' If you fail to so find (nothing else appearing), it would be your duty to answer the first issue 'No.' The first issue being, 'Was the plaintiff injured and damaged by the negligence of the defendants, as alleged in the complaint?' "

But, after stating the contentions in respect thereto, the court instructed the jury further:

"The court charges you that if the plaintiff has satisfied you by the greater weight of the evidence, the burden being upon the plaintiff, that the crossing in question, referred to as North Lee Street crossing, was peculiarly and unusually hazardous, and that the railway company failed to provide gates or signal devices or a flagman or other such means of warning, then the court charges you that such failure on the part of the defendant railway company would constitute negligence, and if you further find from the evidence and by its greater weight that such negligence was the proximate cause of the plaintiff's injury and damage, it would be your duty to answer the first issue 'Yes.' "

This latter instruction is erroneous and harmful in several respects. For convenience in discussion the two excerpts will be referred to as charge No. 1 and charge No. 2.

On the evidence in this case as it appears in the record before us the jury might well have found that the defendant gave an adequate and timely warning of the approach of its train and, therefore, in that respect there was no negligence, and could then have found, under the second charge, that the Lee Street crossing was peculiarly and unusually hazardous and the defendant had failed to maintain at the crossing any gates or other signaling device, constituting negligence under the instruction of the court. We cannot assume that this was not the conclusion of the jury. Thus in this respect the charge was conflicting and erroneous.

What constitutes an unusually dangerous and hazardous crossing is a question of law. It is unusually and peculiarly hazardous within the law so as to require the railroad to maintain some signaling device when and only when the surrounding conditions are such as to render a timely signal by bell and whistle inadequate to warn a traveler approaching the track. Whether the evidence in the case brings the crossing within the definition is for the jury.

The court did not define what constitutes an unusually hazardous crossing. It did tell the jury that the mere fact that a crossing is a much-used one and situated in a populous area does not of itself constitute it an unusually hazardous one, but in that connection he instructed

the jury that "it is for the jury to say whether the crossing in question was, under all the circumstances, peculiarly and unusually hazardous so as to require the railroad in the exercise of due care, to erect gates or signaling devices or maintain a flagman or such other means of warning and safety." Its failure to instruct the jury as to what constitutes an unusually hazardous and dangerous crossing and· its action in leaving this question of law for the determination of the jury was error. If this procedure is to be approved then it will be left to each succeeding jury to decide crossing accident cases according to its own particular view or understanding of what constitutes a hazardous crossing.

This charge as given constitutes a statement that it is negligence *per se* for a railroad company to fail to maintain gates or signaling devices or a flagman at a.crossing which is peculiarly and unusually hazardous, without regard to the principle of due care and without reference to whether an adequate and timely signal had been given by bell and whistle.

On this phase of the first issue it is that part of the charge expressly required by statute, C. S., 564—the declaration and explanation of the law arising on the evidence—and constitutes the chart the· jury was required to follow in arriving at its verdict. The defendant's exception thereto should be sustained.

The general rule is that, in the absence of a statutory requirement, a railroad company is under no duty to provide gates, gongs, or other safety devices at public crossings, and that, therefore, the failure to do so at any particular crossing is not negligence *per se*. *Grand Trunk R. Co. v. Ives,* 144 U. S., 408, 36 L. Ed., 485, 16 A. L. R., 1273 (note), and cases cited; 60 A. L. R., 1096 (note), and cases cited.

The absolute duty of posting a flagman or placing gates or other obstructions or of giving special or personal notice to travelers at railway crossings can only be imposed by the Legislature. Courts and juries, whatever may be thought by them of the convenience or necessity of such or other like precautions at a particular crossing, cannot hold the company to provide them under the penalty of being charged with negligence for the omission. *Weber v. New York C. & H. R. Co.,* 58 N. Y., 451; *Case v. New York, C. & H. R. Co.,* 27 N. Y. Supp., 496; *Kulp Transp. Lines v. Erie R. Co.,* 23 N. Y. Supp., 490.

Nevertheless, evidence of the failure of the railroad company to provide a watchman, gates or gongs, is sometimes admissible on the issue of negligence to enable the jury to determine whether under all the circumstances the defendant has exercised due care and has taken such reasonable precautions as are necessary to give travelers adequate and timely warning of the approach of its train for the protection and safety of those using the crossing. *Blum v. R. R.,* 187 N. C., 640, 122 S. E., 562;

*Dudley v. R. R.,* 180 N. C., 34, 103 S. E., 905; *Batchelor v. R. R.,* 196 N. C., 84, 144 S. E., 542.

On this issue the questions are: (1) Did the railroad company give warning of the approach of its train? and, (2) If so, was such warning both adequate and timely—such that a traveler approaching the particular crossing and exercising ordinary care for his own safety, could and would have heard the signal in time to stop before entering the zone of danger? A breach of this duty to give such warning constitutes negligence.

It is incumbent on a railroad company to take such reasonable precautions as are necessary to the safety of travelers who exercise ordinary care for their own safety at public crossings. *Batchelor v. R. R., supra.* The settled rule is that if a person of ordinary prudence, under all the circumstances, would have maintained a flagman or watchman at the crossing where the plaintiff was injured, then the failure on the part of the railroad company to keep such flagman or watchman constitutes negligence. *Texas Midland R. Co. v. Wiggins,* 166 S. W., 441. Whenever, in the exercise of due care and caution in running its trains it becomes reasonably necessary, considering the nature, location and surroundings of a railroad and a public highway or street, that a watchman should be placed at such crossing or other warning device should be adopted to give notice to travelers of approaching danger and to signal to them when it will be reasonably safe for them to make such crossing, it is the duty of such railroad corporation, independent of any statute or ordinance in that behalf, to place a flagman at such dangerous crossing to perform such duty or to provide some other adequate mode of warning. *Pittsburgh C. C. & St. L. R. Co. v. Talman,* 122 N. E., 357 (Ind.).

Under ordinary circumstances the warning required of a railroad company is given by the ringing of a bell and the blowing of a whistle. *Blum v. R. R., supra; Batchelor v. R. R., supra.* However, conditions may exist at a particular crossing which renders such type of warning inadequate or it may not be timely given. In determining whether a warning by bell and whistle is inadequate and the failure to give some additional warning (by watchman, gong, gates or the like) constitutes negligence, the circumstances existing at the time—such as the frequency with which trains are passing, the amount of travel, the number of tracks, the obstruction of view, the opportunities or want of opportunities for travelers to observe the approach of trains and to hear the signals ordinarily given and the speed of the train—may be considered. See 16 A. L. R.

Before a jury will be warranted in saying, in the absence of any statutory directions to that effect, that a railroad company should keep

a flagman or gates at a crossing it must be first shown that such crossing is more than ordinarily hazardous; as, for instance, that it is in a thickly populated portion of a town or city, and that the view of the track is obstructed either by the company itself or by other obstructions proper in themselves; or that the crossing is a much traveled one and the noise of approaching trains is rendered indistinct and the ordinary signals difficult to be heard by reason of the bustle and confusion incident to railway or other business, or by reason of some like cause. *Grand Trunk R. Co. v. Ives, supra; Tisdale v. Panhandle & S. F. R. Co.,* 16 A. L. R., 1264 (Tex.). Thus in the *Grand Trunk R. Co. case, supra,* the following charge was approved:

"So, if you find that because of the special circumstances existing in this case, such as that this was a crossing in the city much used and necessarily frequently presenting a point of danger, where several tracks run side by side, and there is consequent noise and confusion and increased danger; that owing to the near situation of houses, barns, fences, trees, bushes or other natural objects which afforded less than ordinary opportunity for observation of an approaching train, and other like circumstances of a special nature it was reasonable that the railroad should provide special safeguards to persons using the crossing in a prudent and cautious manner, the law authorizes you to infer negligence on its part for any failure to adopt such safeguard as would have given warning," etc.

The question to be submitted to the jury is not whether in their judgment due care required the railroad company to keep a flagman at the crossing to give warning; not whether that was a suitable mode of giving notice of the approach of a train; not "what signal would be sufficient" to give such notice. But the question is, whether, under the actual circumstances of the case, the company exercised reasonable care and prudence in what it did in undertaking to give adequate and timely notice of the approach of its train, and whether its negligence in failing so to do caused the injuries complained of. *Grippen v. New York C. R. Co.,* 40 N. Y., 46. See also *Beisiegel v. New York C. R. Co.,* 40 N. Y., 9; *Weber v. New York C. & H. R. Co.,* 58 N. Y., 451; *McGrath v. New York C. & H. R. Co.,* 63 N. Y., 522; *Heddles v. Chicago & N. W. R. Co.,* 74 Wis., 239, 42 N. W., 237.

Before it can be said that it was negligence for a railroad company to fail to station a flagman at a crossing "it should be made to appear that the danger was altogether exceptional; that there was something in the case which rendered ordinary care on the part of the traveler an insufficient protection against injury, and, therefore, made assumption of this burden on the part of the railroad company of the employment of a flagman a matter of common duty for the safety of others." *Hass*

CALDWELL *v.* R. R.

*v. Grand Rapids & I. R. Co.,* 47 Mich., 401, 11 N. W., 216. Also see *Grand Trunk R. Co. v. Ives, supra.*

Thus, from the authorities in this and other jurisdictions it may be adduced that:

1. There is no general duty, as such, on the part of a railroad company to place a watchman or flagman at grade crossings of public roads or highways and its failure so to do is not negligence *per se.*

2. It is the duty of a railroad company to give adequate and timely warning of the approach of its trains to a grade crossing.

3. Ordinarily, at grade crossings when no unusually dangerous and hazardous conditions exist, timely signals by ringing the bell and blowing the whistle is deemed to be adequate.

4. When the conditions existing at or about the crossing are such as to render the crossing dangerous and hazardous to the traveling public and tend to render the blowing of a whistle and the ringing of a bell inadequate, evidence of such conditions is admissible to aid the jury in determining whether under all the circumstances the railroad company has exercised ordinary prudence in giving an adequate and timely warning of the danger created by the approach of its train;

5. In every instance, the rule of due care applies, and if a person of ordinary prudence, under all the circumstances, would have maintained a flagman or watchman or other signaling device at the crossing where the plaintiff was injured, then the failure on the part of the railroad company to furnish such additional warning constitutes negligence; and,

6. Where the evidence shows that a railroad crossing is for any reason peculiarly dangerous and the existing conditions tend to render warning by whistle and bell inadequate, it is a question for the jury whether the degree of care which the company is required to exercise to avoid accidents at the crossing imposes on the company the duty to provide additional safety devices.

The subject is fully annotated and the cases cited in 12 A. L. R., 1273, and 60 A. L. R., 1096.

The indicated error is not rendered harmless by the prior correct statement of general principles of law as to the duty of the defendant to exercise due care or by the preceding instructions of the court as to the duty of defendant to give adequate and timely warning of the approach of its train for, from a consideration of the charge as a whole, it appears that the court below conceived that, as to crossings which are unusually dangerous and hazardous, the defendant owes the traveling public a twofold duty: (1) To give adequate and timely warning; and, (2) To provide a watchman or maintain gongs or some other similar safety device. If, however, we construe the charge on the first issue as relating only to the one duty to give adequate and timely warning, then there

is a material conflict in the instructions. *Templeton v. Kelley,* 217 N. C., 164, and cases cited.

For the reasons stated I am unable to join in the majority opinion, but must vote for a new trial.

STACY, C. J., and WINBORNE, J., concur in dissent.